**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| AMY LAMBORN, derivatively on behalf of Nominal Defendant, NEXTERA ENERGY, INC.<br><br>Plaintiff,<br><br>v.<br><br>JOHN W. KETCHUM, JAMES ROBO, ERIC SILAGY, DAVID P. REUTER, NICOLE S. ARNABOLDI, SHERRY S. BARRAT, JAMES L. CAMAREN, KENNETH B. DUNN, NAREN GURSAHANEY, KIRK S. HACHIGIAN, AMY B. LANE, DAVID PORGES, JOHN A. STALL, DARRYL L. WILSON, RUDY E. SCHUPP, JOHN L. SKOLDS, and LYNN M. UTTER,<br><br>Defendants,<br><br>and<br><br>NEXTERA ENERGY, INC.,<br><br>Nominal Defendant. | Case No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Amy Lamborn, ("Plaintiff"), by her undersigned attorneys, brings this shareholder derivative complaint on behalf of nominal defendant NextEra Energy, Inc. ("NextEra" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of NextEra's executive officers seeking to remedy the Individual Defendants'[1] breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon

---

[1] The Individual Defendants are John W. Ketchum, James Robo, Eric Silagy, David P. Reuter, Nicole S. Arnaboldi, Sherry S. Barrat, James L. Camaren, Kenneth B. Dunn, Naren Gursahaney, Kirk S. Hachigian, Amy B. Lane, David Porges, John A. Stall, Darryl L. Wilson, Rudy E. Schupp, John L. Skolds, and Lynn M. Utter.

personal knowledge as to herself and her own acts, and as to all other matters, on information and belief based upon, *inter alia*, the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of the Company's publicly available documents, litigation filings, conference call transcripts and announcements, filings with the U.S. Securities and Exchange Commission (the "SEC"), press releases, news reports, and other publicly available information.

## NATURE OF THE ACTION

1.      This shareholder derivative action arises out of allegations of wrongdoing by the Individual Defendants involving improper political expenditures in violation of state and federal campaign finance laws. The Action is brought on behalf of NextEra against current and former officers of NextEra and members of the Board and asserts claims for breaches of fiduciary duties. The Action also asserts claims for violation of the federal securities laws arising out of the issuance of materially false and misleading statements in the Company's 2022 proxy statement filed with the SEC on April 1, 2022 ("2022 Proxy") and in other public statements that have exposed the Company to massive damages.

2.      NextEra claims to be the world's largest utility company with more than $17 billion in annual revenues. NextEra serves over 11 million customers in the State of Florida through its subsidiary, Florida Power and Light Co., ("FPL"). At all relevant times, NextEra and the Individual Defendants controlled FPL, including its political activities.

3.      Reports surfaced starting in late 2021 in the Orlando Sentinel and Miami Hearld, that FPL and its long-time political consulting firm, Matrix LLC ("Matrix"), had orchestrated a series of improper political expenditures including potential violations of state and federal campaign finance laws. Specifically, reports alleged that FPL's political consultants used a network of nonprofits to steer funding to certain "ghost candidates" intended to derail the campaign efforts of unfriendly legislators

seeking reelection to the Florida state legislature during the 2020 election cycle. Those "ghost candidates" purportedly did not actually intend to run for office. Instead, their candidacy was intended to confuse voters and siphon votes from a bona fide candidate in order to help the opposing party win the election. Later reports alleged that FPL spied on journalists after the publication of unsupportive reporting, and improperly courted public officials, all for the express purpose of benefitting FPL and with the knowing approval of FPL executives. Other subsequent reports tied FPL to "ghost candidates" in the 2018 election cycle as well.

4.      NextEra and FPL denied the existence of the ghost candidate scheme, claiming for over a year that based on findings of an internal investigation, the alleged political misconduct did not expose the Company to any meaningful legal or occupational risk.

5.      On January 25, 2023, however, FPL reported that its President and CEO, Eric Silagy ("Silagy"), who also served as CEO of NextEra, would resign the following month. The same day, NextEra filed a Form 8-K with the SEC specifically acknowledging that FPL faced legal and reputational risks because of the allegations that FPL executives had orchestrated political misconduct.

6.      On this news, NextEra's stock dropped $7.31 per share, or about 8.7%, representing a loss of approximately *$15 billion* in market capitalization.

7.      Defendants breached their fiduciary duties *inter alia* by failing to disclose that FPL's political misconduct exposed NextEra to substantial legal and reputational risk and by failing to maintain adequate internal controls. In light of the above, positive statements about the Company's business, operations, and prospects were also materially misleading and/or lacked a reasonable basis.

8.      As a result of the foregoing, a securities class action was filed against the Company and certain of the Individual Defendants captioned *Jastram v. NextEra Energy, Inc., et al.*, 9:23-cv-80833-AMC (S.D. Fla.) (the "Securities Class Action"). The Securities Class Action alleges that from at least

December 2, 2021, through February 1, 2023, the Defendants intentionally or recklessly made and/or permitted the dissemination of materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. The Securities Class Action and illegal contribution scheme have exposed the Company to enormous expenses, liability, reputational damage, and distraction from its business purpose.

9.      This action seeks to obtain relief on behalf of the Company for its damages incurred as a result of Defendants' conduct as well as prospective relief ensuring that the Company's officers and directors remediate the Company's internal control deficiencies relating to political activities and regulatory compliance.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and SEC Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder.

11.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.      This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.      In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14.      Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as NextEra is headquartered within this District.

4

**PARTIES**

*Plaintiff*

15.     Plaintiff is, and has been at all relevant times, a shareholder of NextEra.

*Nominal Defendant*

16.     Nominal Defendant NextEra is incorporated under the laws of the State of Florida, with its principal executive offices located at 700 Universe Boulevard, Juno Beach, Florida. NextEra describes itself as a holding company incorporated in 1984 as a Florida corporation, that conducts its operations principally through its wholly-owned subsidiaries, FPL, and indirectly through NextEra Energy Capital Holdings, Inc., NextEra Energy Resources, LLC and NextEra Energy Transmission, LLC (collectively "NEER").

*The Individual Defendants*

17.     John W. Ketchum ("Ketchum") has served as a director of the Company since March 2022 and Chairman since July 2022. He also served as chairman of FPL since February 2023. Prior to his succession to the role of CEO, he served as president and CEO of NextEra Energy Resources, LLC, the Company's competitive energy supplier subsidiary and the world's largest generator of renewable energy from the wind and sun and a world leader in battery storage. Ketchum joined NextEra in 2002 and has a business, finance and legal background across key executive roles and NextEra, NextEra Energy Resources and NextEra Energy Partners, LP ("NEP"). Ketchum is CEO and a director of NEP, a publicly-traded growth-oriented limited partnership formed by NextEra to acquire, manage and own contracted clean energy projects. According to the Company's public filings, Ketchum was paid $1,400,000 and $1,500,000 in 2021 and 2022, respectively.

18.     Silagy was FPL's CEO from May 2014 until February 15, 2023, and he resigned from FPL effective May 15, 2023.

19.     James Robo ("Robo") became the Company's CEO in July 2012 and Chairman of the Board in December 2013. Robo retired from both positions on March 1, 2022.

20.     David P. Reuter ("Reuter") was the corporate spokesperson for FPL during the relevant period.

21.     Nicole S. Arnaboldi ("Arnaboldi") has served as a director of the Company since October 2022. According to the Company's public filings, Arnaboldi was paid $85,161 for her service on the Board in 2022, which began in October 2022.

22.     Sherry S. Barrat ("Barrat") has served as a director of the Company since 1998. According to the Company's public filings, Barrat was paid $341,493 and $371,435 by the Company in 2021 and 2022, respectively.

23.     James L. Camaren ("Camaren") has served as a director of the Company since 2002. According to the Company's public filings, Camaren was paid $311,493 and $339,435 by the Company in 2021 and 2022, respectively.

24.     Kenneth B. Dunn ("Dunn") has served as a director of the Company since 2010. According to the Company's public filings, Dunn was paid $341,493 and $355,435 by the Company in 2021 and 2022, respectively.

25.     Naren Gursahaney ("Gursahaney") has served as a director of the Company since 2014. According to the Company's public filings, Gursahaney was paid $334,878 and $370,435 by the Company in 2021 and 2022, respectively.

26.     Kirk S. Hachigian ("Hachigian") has served as a director of the Company since 2013. According to the Company's public filings, Hachigian was paid $331,493 and $357,435 by the Company in 2021 and 2022, respectively.

27.     Amy B. Lane ("Lane") has served as a director of the Company since 2015. According

to the Company's public filings, Lane was paid $338,493 and $367,435 by the Company in 2021 and 2022, respectively.

28.     David Porges ("Porges") has served as a director of the Company since February 2020. According to the Company's public filings, Porges was paid $319,493 and $343,435 by the Company in 2021 and 2022, respectively.

29.     John A. Stall ("Stall") has served as a director of the Company since May 2022. Stall previously served in numerous leadership roles at NextEra before retiring in 2010. According to the Company's public filings, Stall was paid $226,054 by the Company in 2022.

30.     Darryl L. Wilson ("Wilson") has served as a director of the Company since 2018. According to the Company's public filings, Wilson was paid $321,493 and $340,435 by the Company in 2021 and 2022, respectively.

31.     Rudy E. Schupp ("Schupp") served as a director of the Company at all relevant times until his retirement in May 2023. According to the Company's public filings, Schupp was paid $319,493 and $361,435 by the Company in 2021 and 2022, respectively.

32.     John L. Skolds ("Skolds") served as a director of the Company at all relevant times until his retirement in May 2023. According to the Company's public filings, Skolds was paid $341,493 and $362,435 by the Company in 2021 and 2022, respectively.

33.     Lynn M. Utter ("Utter") served as a director of the Company from November 2021 until May 2022. According to the Company's public filings, Utter was paid $325,493 and $325,493 by the Company in 2021 and 2022, respectively.

***Non-Parties***

34.     Non-party Dev Stahlkoph ("Stahlkoph") was appointed to the Board in May 2023.

35.     Non-party Maria G. Henry ("Henry") was appointed to the Board in September 2023.

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

36.     By reason of their positions as officers and/or directors of NextEra, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants (defined below) owed NextEra and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NextEra in a fair, just, honest, and equitable manner. The Director Defendants were and are required to act in furtherance of the best interests of NextEra and its shareholders.

37.     Each director and officer of the Company owes to NextEra and its shareholders the fiduciary duty of good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

38.     Because of their positions of control and authority as directors and/or officers of NextEra, the Director Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

39.     To discharge their duties, the officers and directors of NextEra were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

40.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of NextEra, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

41.     As senior executive officers and directors of a publicly-traded company whose stock was registered with the SEC pursuant to the Securities Act and traded on the NYSE, the Director

Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

42.     To discharge their duties, the officers and directors of NextEra were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of NextEra were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida and the United States, and pursuant to NextEra's own Code of Conduct;

(b)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Remain informed as to how NextEra conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of NextEra and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NextEra's operations would comply with all applicable laws and NextEra's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)      Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

43.      The Director Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NextEra.

44.      At all times relevant hereto, the Director Defendants were the agents of each other and of NextEra and were at all times acting within the course and scope of such agency.

45.      Each of the Director Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## NEXTERA'S CODE OF CONDUCT

46.      NextEra maintains a Code of Business Conduct and Ethics ("Code") that applies to all the Individual Defendants.

47.      The Code provides that:

*Violations of our Code, values, policies or the law may carry serious consequences for* the individuals involved, as well as for *NextEra Energy as a whole*. Those engaging in unethical or illegal behavior, and those who direct, condone, approve, or facilitate such behavior, may be subject to legal action and disciplinary action, up to and including termination. *It is this sort of behavior that puts all of us at risk of a damaged reputation, negatively affects our stakeholders and may subject us to fines and civil or criminal liability*.[2]

48.     In a section titled "Legal Responsibilities," the Code provides:

Regardless of title, position or tenure, *you have a duty to know and strictly follow this Code, the law, and all Company policies*. Additionally, *you must know and follow the laws and regulations that apply to the work you do and the places where we do business* – whether they are in or outside of the United States. Where you are unclear about the meaning or importance of a section of this Code, you should not hesitate to ask questions. *You must certify, on an annual basis, that you have read and understand our Code.*

49.     In a section titled "We Do Not Resort to Corruption or Bribery," the Code states:

As part of our commitment to winning business the right way, NextEra Energy will never tolerate bribery in any form. Even if we lose business or encounter delays because of our refusal to do so, we will never bribe any third party, or allow or condone third parties to do so on behalf of NextEra Energy. We believe in ethically winning business through the quality of our products and services, never through bribery. We abide by laws, treaties, and regulations that forbid bribery, including the U.S. foreign Corrupt Practices Act. To be a responsible member of our business community, you must follow these laws wherever you do business, regardless of local law or custom. This means you may not offer, attempt to offer, authorize, or promise any sort of bribe or kickback for the purpose of obtaining or retaining business or an unfair advantage. Moreover, you may not solicit or accept a bribe…

*It is also important to note that you may not hire a third party to do something that you cannot ethically or legally do yourself. Engaging a third party to indirectly make an improper payment violates not only this Code, but also anti-corruption laws*. Before you engage a third party that is anticipated to work with foreign government officials on your behalf, you must complete the Request to Engage an International Business Party form.

50.     The Code further states that:

*The same rules apply to your participation in political activities*. You have the right – and are even encouraged – to individually and voluntarily donate your time and money to the political process. However, your participation may not

---

[2] Bold and italics added in all paragraphs quoting from the Code.

occur on Company time or at NextEra Energy's expense. This means, for example, that you should never engage with your fellow employees on behalf of a political candidate during the workday or expect to be reimbursed by our Company for your personal political contributions. If you want to use Company property, facilities, time, or funds for political activities, it must be pre-approved as set forth in the table at the end of this section. You must not engage in lobbying activities on behalf of NextEra Energy, without prior consent from the applicable Vice President according to the table that follows. Further, lobbying activities may require disclosure and may be subject to specific rules that are often complicated and subject to change. It is your responsibility to ensure that you are in compliance with the applicable laws.

*In most – if not all – states and countries, it is illegal to make contributions or give gifts to politicians, political parties, or public officials that are intended to influence official actions.* Therefore, as described earlier in this Code, *NextEra Energy funds may not be used to contribute to any political party, committee, candidate, or holder of any government position unless such contribution is permitted by law and complies with our Company policy.* Any contributions of corporate funds or other assets must promote the interests of our Company and be made without regard for private political preferences.

51.     In a section titled "We Communicate Truthfully With The Public," the Code states:

"*We always communicate truthfully with the public.* At the same time, we are consistent in our messaging and careful to promote our Company's best interests. For this reason, only authorized individuals can speak with the media on NextEra Energy's behalf."

52.     In a section titled "We Compete With Integrity," the Code states:

At NextEra Energy, we believe in competing vigorously, but we never sacrifice our integrity to win business. This means we comply with all applicable antitrust and competition laws, wherever we do business. While they can be complex, these laws are meant to ensure a level playing field and fair competition in the marketplace. In practice, these laws require that we make independent business decisions, never engaging in unfair business practices, scheming with our competitors or making other fraudulent business arrangements.

## ADDITIONAL DUTIES OF THE AUDIT COMMITTEE

53.     NextEra's Audit Committee Charter provides that the committee is vested with

oversight of:

(1) the integrity of the financial statements of the Company; (2) the independent auditor's qualifications and independence; (3) the performance of the Company's internal audit function and independent auditor; (4) the compliance by the

Company with legal and regulatory requirements; and (5) the accounting and financial reporting processes of the Company and audits of the financial statements of the Company.

54.   The Audit Committee Charter states that "[t]he function of the Committee is oversight."

55.   In the section titled "Financial Statement and Disclosure Matters", the Audit Committee Charter states, the committee will:

> Meet to review and discuss with management and the independent auditor the annual audited financial statements of the Company, including reviewing disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), and recommend to the Board whether such audited financial statements should be included in the Company's Form 10-K.

> Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements (including reviewing disclosures made in MD&A).

> Review major issues regarding accounting principles and financial statement presentations, including any significant changes made in the Company's selection or application of accounting principles and practices, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

> Review and discuss reports from the independent auditor on:

>> Critical accounting policies and practices to be used, as identified to the Committee by the independent auditor. o All alternative treatments of financial information within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

>> Other material written communications between the independent auditor and management, such as any schedule of unadjusted differences and any "management letter" or "internal control letter" issued or proposed to be issued by the independent auditor.

> Review and discuss with management and the independent auditor management's internal control report required to be included in the Company's annual report on Form 10-K, management's assessment of the internal control structure and procedures of the Company for financial reporting, and the independent auditor's opinion on the effectiveness of the Company's internal control over financial reporting.

13

Afford the chief financial officer and chief accounting officer open lines of communication to the Committee.

Discuss with management the earnings releases of the Company, including the use of "pro forma" or "adjusted" non-GAAP information therein, as well as financial information and earnings expectations provided to analysts and rating agencies. This may be done generally through a discussion from time to time (and need not be in advance of each such release or provision of such guidance) of the types of information to be disclosed and the types of presentations to be made.

Discuss with management and the independent auditor the effect of regulatory and accounting initiatives on the Company's financial statements.

Discuss with management and the independent auditor the effect of off- balance sheet structures on the Company's financial statements.

Discuss with management the Company's policies with respect to risk assessment and risk management.

Review and discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

Ensure that risks identified from time to time as major risks are reviewed by the Board or a Board Committee.

Discuss with the independent auditor the matters required to be discussed by Auditing Standard No. 16, as amended or supplemented, relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management, and management's response.

Review disclosures made to the Committee about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

56.     In the section titled "Oversight of the Company's Internal Audit Function", the Audit Committee Charter states, the committee will *inter alia* "[r]eview the significant reports to management prepared by the internal auditing department and management's responses."

57.     In the section titled "Compliance Oversight Responsibilities", the Audit Committee Charter states, the committee will -

Afford the individual or individuals with operational responsibility for the

compliance and ethics program an open line of communication to the Committee, including the authority to communicate to the Committee (1) promptly on any matter involving criminal conduct or potential criminal conduct, and (2) no less than annually on the implementation and effectiveness of the compliance and ethics program.

Review management reports with respect to the conformity of the Company and its affiliated entities with applicable legal and regulatory requirements. Review compliance with the Company's Code of Business Conduct & Ethics and with the Code of Ethics for Senior Executive and Financial Officers, including review of any violations and waivers of such codes of ethics.

Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

Discuss with the Company's General Counsel legal matters that the General Counsel believes are reasonably possible to have a material impact on the Company's financial statements, internal controls or compliance policies.

## BACKGROUND

58.     NextEra describes itself as one of the largest electric power and infrastructure companies in North America, and a leader in the renewable energy industry. NextEra generates substantially all of its operating revenues from FPL and NEER, which primarily include revenues from contracts with customers, as well as derivative and lease transactions at NEER. According to the Company's SEC filings and historic financial statements, FPL generates the lion's share of the Company's revenue. *See, e.g*., NextEra Quarterly Report on Form 10-Q for the quarter ending June 30, 2023, filed with the SEC July 26, 2023, ("2023 Q2 Form 10-Q") showing that FPL accounted for $4.8 billion out of a total $6.3 billion in revenue for the three months ended June 30, 2023, and $8.7 billion out of a total of $12 billion for the six months ended June 30, 2023.

**NextEra Repeatedly Rejects Shareholder Requests for More Transparency**

59.     Recognizing the significant reputational harm and business risks that improper political activity might cause the Company, certain shareholders of NextEra repeatedly asked the Board for additional transparency and disclosure of political activity and contributions. For example, every year from 2015 through 2019, a large institutional shareholder of NextEra, the New York State Common Retirement Fund (the "Fund"), advanced a shareholder proposal in connection with the Company's annual meeting, that would require the Company to provide disclosures and transparency in connection with its political contributions. The Fund argued, among other things, that such disclosure was in the best interest of the Company and its shareholders. Each year, NextEra's Board fought back, opposing those proposals and recommending that shareholders vote *against* them arguing, among other things, that additional disclosures were not in the Company or shareholders' best interest.  Ultimately, the proposals advanced by the Fund failed.

60.     For example, NextEra's proxy statement filed with the SEC March 25, 2015, on Schedule 14A, included the shareholder proposal as set forth below:

**Proposal 9: Shareholder proposal**

The Comptroller of the State of New York, Thomas P. DiNapoli, 59 Maiden Lane 30th Floor, New York, NY 10038, is the trustee of the New York State Common Retirement Fund (the "Fund") and has given the Company notice that he intends to present this proposal at the annual meeting on behalf of the Fund. The Fund held a total of 1,253,149 shares of common stock as of the date the proposal was submitted. In accordance with SEC regulations, the text of the shareholder proposal and supporting statement appear exactly as received by the Company (including the use of boldface and italics). The shareholder proposal may contain assertions about the Company or other matters that the Company believes are incorrect, but the Company has not attempted to refute all of those assertions. All statements contained in the shareholder proposal and supporting statement are the sole responsibility of the proponent. The Company disclaims responsibility for the content of the proposal and the supporting statement, including sources referenced in the supporting statement.

**Proposal 9—Political Contribution Disclosure**

**Resolved**, that the shareholders of **NextEra Energy Inc.** ("NextEra" or "Company") hereby request that the Company provide a report, updated semiannually, disclosing the Company's:

1.     Policies and procedures for making, with corporate funds or assets, contributions and expenditures (direct or indirect) to (a) participate or intervene in any political campaign on behalf of (or in opposition to) any candidate for public office, or (b) influence the general public, or any segment thereof, with respect to an election or referendum.

2.     Monetary and non-monetary contributions and expenditures (direct and indirect) used in the manner described in section 1 above, including:

    a.     The identity of the recipient as well as the amount paid to each; and

    b.     The title(s) of the person(s) in the Company responsible for decision making.

The report shall be presented to the board of directors and posted on the Company's website within 12 months from the date of the annual meeting.

61.     The New York Comptroller offered the following reasons in support of the proposal:

**Supporting Statement**

As long-term shareholders of NextEra, we support transparency and accountability in corporate spending on political activities. These include any activities considered intervention in any political campaign under the Internal Revenue Code, such as direct and indirect contributions to political candidates, parties, or organizations; independent expenditures; or electioneering communications on behalf of federal, state or local candidates.

Disclosure is in the best interest of the company and its shareholders. The Supreme Court said in its *Citizens United* decision: "[D]isclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."

Publicly available records show that NextEra contributed at least $4.8 million in corporate funds since the 2004 election cycle. (CQ: http://moneyline.cq.com and National Institute on Money in State Politics: http://www.followthemoney.org) Meanwhile, the *2014 CPA-Zicklin Index of Corporate Political Disclosure and Accountability* rated NextEra near the bottom among the largest 300 companies in the S&P 500, giving it just 29 points out of 100.

Gaps in transparency and accountability may expose the company to reputational and business risks that could threaten long-term shareholder value. This may be especially true for NextEra, which the non-profit group Public Campaign criticized in a December 2011 report, *For Hire: Lobbyists or the 99%?* The report

34

---

Table of Contents

alleged that 29 companies, including NextEra, paid no federal income taxes between 2008 and 2010 while spending millions on campaign contributions and lobbying and increasing their executive compensation.

The proposal asks NextEra to disclose all of its political spending, including payments to trade associations and other tax exempt organizations used for political purposes. This would bring our Company in line with a growing number of its peers, including **Exelon Corp.**, **Edison International**, and **PG&E Corp.**, that support political disclosure and accountability and present this information on their websites.

The Company's Board and its shareholders need comprehensive disclosure to be able to fully evaluate the political use of corporate assets. We urge your support for this critical governance reform.

**Political Contribution Disclosure—Proposal 9**

62.     Notably, the Fund's Supporting Statement concludes that "[g]aps in transparency and accountability may expose the company to reputational and business risks that could threaten long-term shareholder value."  The Fund's Supporting Statement also cited a report by *Public Campaign* titled "For Hire: Lobbyists or the 99%? How Corporations Pay More for Lobbyists Than Taxes."  The report, published in December 2011, examined lobbying expenditure data and publicly available data on job creation, federal campaign contributions and executive compensation between 2008 and 2010 to understand how some of the largest corporations in the U.S. were spending their cash.  The Company was one of 30 companies profiled.  The report showed that NextEra made $6.403 billion in profit during the three-year period examined, yet it paid negative -$139 million in federal taxes amounting to an effective federal tax rate of negative -2%. It also spent $9.99 million on lobbying and increased executive compensation by 14% during that same period. The report attempted to analyze federal

17

campaign contributions for the 30 companies profiled, however, for two of those companies—NextEra being one of the two—that information was not available.

63.     The Board opposed the proposal and unanimously recommended that shareholders vote against it. The Board claimed that NextEra while needs to participate in the legislative and regulatory process, the proposal was unnecessary and duplicative of existing disclosure requirements and NextEra's Political Contributions Policy, that requiring additional reporting would not be the best use of NextEra's resources, and that additional disclosure might tip a competitor's hand and thus hinder the Company's ability to pursue its business and strategic objectives.

64.     The Board's opposition is set forth below:

**The Board Recommends a Vote AGAINST the Foregoing Proposal for the Following Reasons:**

The Board believes that adopting the shareholder proposal would not be in the best interests of the Company or its shareholders.

*NextEra Energy needs to be an effective participant in the legislative and regulatory process.* The Company is closely regulated and subject to legislation that can impact the Company's operations and profitability. The Board believes that it is in the best interests of the Company's shareholders for NextEra Energy to be an effective participant in the political process. Laws and policies enacted and adopted by federal, state and local authorities can have a significant impact on the Company and its customers, employees and shareholders. NextEra Energy actively encourages public policy that furthers its ability to provide the cleanest, most reliable electricity to our customers and to operate efficiently, safely and profitably. NextEra Energy's active participation in political processes and public policy is appropriate to ensure that public officials are informed about key issues that affect the Company's interests and those of our customers, employees, shareholders and the communities served.

*NextEra Energy already has a Political Contributions Policy and its political contributions are regulated by the government.* NextEra Energy maintains a rigorous compliance process to ensure that the Company's political activities are lawful, properly disclosed and aligned with our Code of Business Conduct & Ethics. Political contributions are also subject to comprehensive regulation by federal, state and local governments with detailed disclosure requirements, including requirements to file reports with appropriate state and federal agencies on lobbying-related activities and expenditures. We are committed to compliance with all such applicable laws.

*The proposal is unnecessary and duplicative because NextEra Energy's political contributions are already subject to extensive disclosure requirements.* The Board believes that adoption of this resolution is unnecessary and duplicative. NextEra Energy already discloses its Political Contributions Policy and the process for and the titles of the individuals responsible for authorizing contributions pursuant to such policy. NextEra Energy already reports corporate lobbying-related activities and expenditures as required to appropriate federal, state and local agencies. Information about the Political Contributions Policy and NextEra Energy's political action committee ("PAC") contributions and current lobbying activities can be found in reports filed with various state and federal agencies, which are also available through links on the NextEra Energy Investor Relations website at *http://www.investor.nexteraenergy.com.*

*Adopting the proposal would not be the best use of NextEra Energy's resources because adequate disclosure already exists.* Since disclosure of the Company's policies and procedures regarding lobbying activities, business associations and PAC contributions are already readily available to the public and Company shareholders through the link on the Company's website described above, the Board believes that the additional reports requested in the proposal would result in an unnecessary and

35

---

Table of Contents

unproductive use of the Company's resources. As a result of the disclosures mandated by federal and state laws, the Board has concluded that ample disclosure exists regarding NextEra Energy's political contributions. Because the Company is committed to complying with applicable current and future political contribution and campaign finance laws, and already publicly discloses its political contributions as required by law, the Board believes that the special report requested in this proposal is an unnecessary use of the Company's resources.

*Additional disclosure requirements could hinder the Company's ability to pursue its business and strategic objectives.* It is the Board's view that subjecting the Company to additional disclosure requirements could hinder the Company's ability to pursue its business and strategic objectives. Such disclosure would make it easier for competitors and others to discern the Company's public policy and political strategies and implement strategies opposed to the Company's public policy goals, which would prevent the achievement of such goals and could negatively affect the Company, its operations and results. NextEra Energy's responsible participation in the political process and its prudent expenditures in connection with such participation are in the best interests of the Company, its shareholders and its customers.

> FOR THE ABOVE REASONS, THE BOARD UNANIMOUSLY RECOMMENDS A VOTE <u>AGAINST</u> THIS PROPOSAL

Unless you specify otherwise in your proxy/confidential voting instruction card or in the instructions you give on the Internet or by telephone, your proxy will be voted **AGAINST** proposal 9.

36

65.　　The shareholder proposal did not pass, with purportedly 60.4% voting against it. However, the structure of the vote whereby a shareholder had to expressly indicate they supported the proposal otherwise a proxy would automatically be voted against the proposal likely impacted that result.

19

66.    In 2016, the Fund, through Mr. DiNapoli, advanced the same proposal again, which was set forth in NextEra's proxy statement filed with the SEC on March 31, 2016, on Schedule 14A. The Fund's Supporting Statement repeated the prior year's statement that "[g]aps in transparency and accountability may expose the company to reputational and business risks that could threaten long-term shareholder value," and added "[t]his may be especially true for NextEra. . . ."

67.    The Board again opposed the proposal as not in the best interests of the Company and noted that **"*[t]he very same proposal from the same proponent was defeated by the Company's shareholders at the 2015 annual meeting of shareholders.*"** (Bold and italics in original).  Like the 2015 proposal, the 2016 proposal did not pass, with purportedly 57.3% of voting shares voting against.

68.    The Fund advanced the same proposal again in 2017, which was set forth in NextEra's proxy statement filed with the SEC on March 27, 2015, on Schedule 14A.  The Fund's Supporting Statement for the 2017 proposal included the following statement:

> Publicly available records show that NextEra contributed over $11.6 million in corporate funds since the 2004 election cycle. . .
>
> However, publicly available data does not provide a complete picture of the Company's political spending. For example, the Company's payments to trade associations and "social welfare organizations"—organized under section 501(c)(4) of the IRS Code—used for political activities are undisclosed and unknown. This proposal asks the Company to disclose all of its political expenditures, including payments to trade associations and other tax-exempt organizations.

69.    The Fund's point—that payments by the Company to 501(c)(4) organizations are undisclosed and unknown—is significant in that payments to exactly those same types of 501(c)(4) organizations were at the heart of the ghost candidate and other scandals.

70.    The Board again opposed the Fund's 2017 shareholder proposal noting that the same proposal was defeated at the 2015 and 2016 annual meetings. The proposal did not pass with purportedly 58.8% voting against it.

71.     The Fund continued to advance the same proposal in connection with the 2018 and 2019 annual meetings, which were set forth in NextEra's proxy statements filed with the SEC on April 6, 2018 and April 5, 2019 respectively on Schedule 14A.  Again, the Board opposed the proposals and recommended that shareholders vote against the additional disclosures, notably while the ghost candidate scheme was under way.  The proposals again were defeated in 2018 with purportedly 56.8% voting against the proposal, and narrowly defeated in 2019 with 48.7% voting in favor of the proposal.

72.     The next year, a different group of shareholders advanced a substantially identical proposal in connection with the Company's 2020 annual meeting.  NextEra took extensive steps to oppose the proposal first trying to block the proposal from making its way into the proxy statement. More specifically, on December 6, 2019, Bruce Herbert, Chief Executive and Accredited Investment Fiduciary of the organization Newground Social Investment sent a letter via fax and email on behalf of eight NextEra shareholders to NextEra's Vice President, Compliance & Corporate Secretary, W. Scott Seeley, attaching the shareholder proposal "for consideration and action at the next annual meeting" and for inclusion in the upcoming 2020 proxy statement.

73.     On December 10, 2019, Seely sent Mr. Herbert a deficiency letter claiming that the December 6, 2019 submission did not comply with Rule 14a-5 under the Securities Exchange Act of 1934, and was therefore not eligible for inclusion in NextEra's 2020 proxy statement.  Mr. Herbert responded providing proof that each of the shareholders Newground represented was a beneficial owner of NextEra shares, and that Newground was their authorized agent, thus curing the defects alleged by NextEra.

74.     Next, on January 10, 2020, Seeley sent a letter to the SEC Division of Corporation Finance, Office of the Chief Counsel (the "no-action request"), stating the Company's intent to exclude the Newground proposal from the proxy materials for NextEra's 2020 annual meeting. The stated

purpose of the no-action request was to seek confirmation that the SEC would not recommend

enforcement action if NextEra excluded the proposal.  In other words, NextEra was seeking the SEC's

blessing to exclude the proposal from the proxy materials.

75.     The no-action request detailed NextEra's purported reasons for excluding the proposal,

arguing that the proposal had been substantially implemented by the Company's policies, practices and

procedures, thus the proposal was duplicative and not necessary.  More specifically, NextEra argued

that "the Company has already provided shareholders with the information requested by the proposal,

and provides precisely the 'transparency and accountability in corporate electoral spending' that the

Proposal requests." Seeley Ltr. p. 4.  The no-action request then went on to explain how as a result of

the Company's outreach to certain of its largest shareholders following the near passage of the proposal

in 2019, and as a result of the feedback from the outreach, NextEra's Governance and Nominating

Committee instituted enhancements to the Company's policies and procedures regarding political

contributions and expenditures, and "as a result of these enhancements, the Company's existing

practices and procedures, including its public disclosures, compare favorably with the guidelines of

the proposal, and achieve the Proposal's essential objective of providing transparency regarding the

Company's political contributions." Id. p.p. 4-5.

76.     The no-action request continued:

> Most importantly, the Company formalized Board level oversight of the
> Company's political spending and disclosures. The Company overhauled its
> Political Engagement Policy (available on its website[1]), giving specific
> responsibility to the Board's Governance and Nominating Committee, with the
> support of the Company's Executive Vice President and General Counsel, to
> review at least annually, the following political activities, contributions by the
> NextEra Energy, Inc. Political Action Committee ("Company PAC");
> contributions by the Company to candidates and committees; the Company's
> contributions to all U.S. tax-exempt organizations that are primarily engaged in
> political activities; and the Company's significant trade association dues. The
> emended policy also requires an annual review of significant trade association
> memberships by the Company's Vice President Government Affairs-Federal to

assure that the memberships align with corporate strategy.

77.     The no-action request attached a blackline of the Political Engagement Policy, and further argued that the enhanced Policy achieved all the objectives of the proposal.

78.     On February 24, 2020, Mr. Herbert, on behalf of Newground, sent an eleven-page response to the no-action letter to the S.E.C. (the "Rebuttal"). The Rebuttal laid out in detail, that despite NextEra's claims to the contrary, "NextEra has not implemented any of the core requests of the Proposal. . ." The rebuttal explains how the details offered in the no-action request "are largely irrelevant to the Proposal and fail to fulfil the guidelines or essential purpose as outlined in the Proposal." For example, the Rebuttal demonstrates that the proposal asks the Company to publish a list of direct and indirect election-related contributions and expenditures that, "importantly, are <u>made with corporate funds or assets</u>." However, the no-action request directs the SEC's attention to two entirely different categories: "(a) contributions made by NextEra Energy, Inc. Political Action Committee (NextEra PAC")"; and (b) Company federal and state lobbying disclosures—neither of which the proposal requested." The Rebuttal explains that, by definition, contributions from the NextEra PAC "are <u>not</u> from corporate treasury funds. . ."

> Disclosure of NextEra PAC contributions is neither requested by nor even mentioned in the Proposal. Rather, the Proposal specifically requests disclosure of election-related contributions made "<u>with corporate funds or assets</u>." (emphasis added). Absent voluntary disclosures from the Company, such contributions are essentially impossible to track, hence, why they constitute one of the essential core requests for the Proposal.

> *     *     *

> The fact of the matter is that the main thrust of the [no-action request] is not relevant to the proposal, to the Proponent's intent, or to any discussion of Rule 14a-8 no-action consideration. In many respects, the [no-action request] appears oriented toward diverting Staff attention away from the four corners of the Proposal itself, toward evidence that is impermissible and not relevant to this discussion and consideration.

79.     The Rebuttal then identifies certain "glaring omissions and non sequitur re-directs" in

the no-action request that are "critical to understanding the extent to which NextEra <u>has not</u> substantially implemented the Proposal's requests."

> The Proposal unambiguously asks NextEra to report on how it deals with direct and indirect spending on elections and to disclose all such expenditures made by the Company. NextEra's policies do not address critical areas of the Proposal's request regarding electoral spending, nor does the Company's website disclosure or policies address payments to social welfare organizations or trade associations. Accordingly, the Proposal has not been substantially implemented, which would make exclusion pursuant to Rule 14a-8(i)(10) inappropriate.

80.      In addition, the Rebuttal offered third-party verification that the Proposal had not been substantially implemented, including the non-partisan CPA-Zicklin Index annual ranking of the thoroughness and quality of corporate political disclosure made by S&P 500 companies where in 2019, NextEra scored "just 25.7 out of a possible 100" whereas in "stark contrast" . . . "NextEra's self-identified industry peers uniformly rank multiple times higher." The Rebuttal further notes that:

> [t]he Proposal was written with the tenets of the Conference Board *Handbook* and the CPA-Zicklin Index in mind. Thus, if the Company in fact had policies in place and had implemented disclosures as contemplated by the Proposal, it would enjoy a high index ranking. The fact it does not, itself constitutes compelling evidence that the Proposal has not been substantially implemented.

81.      The Rebuttal then lists "six key categories" regarding election-related contributions and expenditures as organized by the CPA-Zicklin Index and concludes, "[i]n stark contrast to its claims of substantial implementation, NextEra **makes no disclosures in any of these areas of <u>election-related</u> spending**." (emphasis in the original).

82.      Ultimately, the SEC did not grant the no-action request and the proposal appeared in the 2020 proxy statement filed with the SEC on April 3, 2020. The Board again recommended that shareholders vote against the proposal and essentially parroted the reasons set forth in the no-action request—that the Company already substantially implemented the proposal, that the enhanced Political engagement Policy provides sufficient oversight, and that the Company discloses on its website, among

other things, specific contributions by the NextEra PAC to federal candidates, federal committees, state candidates and state committees.

83.     As revealed by the specific points made by Newground in the Rebuttal, the statements in the 2020 proxy materials regarding substantial implementation, disclosure and oversight were highly misleading. Notwithstanding, the proposal did not pass a shareholder vote and was not approved.

**NextEra and FPL's History of Improper Business Practices and Political Activities**

84.     Set forth below are examples of NextEra and FPL's willingness to engage in questionable business practices and improper political activities.

**NextEra's Underhanded Political Plays in Canada**

85.     After Canada passed the Green Energy Act in 2009, NextEra used shady political tactics to vie for the lucrative 20-year fixed price contracts, which paid companies far more to generate wind power than direct customers would due to large government subsidies.[3] A lawsuit brought by one

---

[3] *Gust of bids delays wind awards*, The London Free Press (November 24, 2015), https://lfpress.com/2015/11/24/gust-of-bids-delays-wind-awards, (last accessed October 23, 2023).

competing company alleging "undo political interference"[4] revealed that NextEra used donations and inside relationships to gain "exclusive access through private meetings with important government officials" to tilt the bidding process in NextEra's favor.[5]

86.     Documents revealed that NextEra executives and lobbyists had meetings and calls with "high-level officials at the Ontario Ministry of Energy, the premier's office, and the power authority" during the bidding process, when other companies were instructed to cease contact with officials until the contracts were awarded. In fact, when NextEra requested information, "officials sometimes responded within hours" to the company's well-connected lobbyists.[6]

87.     One such lobbyist, Bob Lopinski, a recent senior advisor to the Ontario premier Dalton McGuinty, circumvented the quiet period procurement rules by covertly contacting former colleagues to arrange meetings for NextEra senior executives, including then CEO Mitch Davidson.[7]

88.     In 2015, after many municipalities declared themselves "unwilling hosts" for the large wind energy projects, Ontario's Independent Electricity System Operator (IESO), changed the proposal process to allocate additional points to bids that garnered municipal support.[8] This meant that if a company met with the municipal government, got local officials to sign a "Community Commitment Agreement" and also got municipal endorsement, that company's project would be

---

[4] *Id.*

[5] Stevenson, *For Pickens, Wind Claim May Be Last Power Play,* The New York Times (Oct. 15, 2015), https://www.nytimes.com/2015/10/16/business/dealbook/for-pickens-wind-claim-may-be-last-power-play.html (last accessed October 23, 2023).

[6] *Id.*

[7] *Id.*

[8] *Gust of bids delays wind awards*, The London Free Press (November 24, 2015), https://lfpress.com/2015/11/24/gust-of-bids-delays-wind-awards (last accessed October 23, 2023).

the most "likely to be approved." In turn, NextEra's political strategy quickly shifted focus to local extortion.[9]

89.    NextEra tried to entice local officials with "community vibrancy funds" that were "contingent on municipal councils passing favo[]rable resolutions" that supported and endorsed NextEra's business plans.[10]  For example, NextEra offered North Frontenac, a small rural town in Ontario, a community vibrancy fund of $200,000 per year for 20 years, in addition to the projected tax revenue increase of $100,000 or more per year (a total of $6 million), on two conditions: (1) the township pass a motion supporting NextEra's project bid; and (2) NextEra's project bid winning approval.[11]

90.    Ben Greenhouse, NextEra's senior Canadian executive, explicitly stated that community vibrancy funds were "conditional on municipal support" and this message was consistently reinforced by others at NextEra in emails to municipal officials.[12] However, if the municipality would not sign the agreement, and NextEra's bid won anyway, the municipality would get nothing.

91.    Disgusted by the obvious manipulation, pressure, and extortion, many municipalities refused NextEra's terms and pushed back by declaring that they were *not* "willing" townships, making it more difficult for NextEra to compete with other bidders.[13]

---

[9] Ellis, *Warwick mayor calls wind money 'extortion,'* The Independent (July 29, 2015), https://petrolialambtonindependent.ca/2015/07/29/warwick-mayor-calls-wind-money-extortion/# (last accessed October 23, 2023).

[10] Laforet, *Corruption In The Green Energy Sector Costs Ontarians*, HuffPost (November 26, 2015), https://www.huffpost.com/archive/ca/entry/corruption-in-the-green-energy-sector-costs-ontarians_b_8647512.

[11] Green, *North Frontenac set to reject wind farm proposal*, Frontenac News (June 10, 2015), www.windconcernsontario.ca/2015/07/30/ontario-mayor-says-wind-power-process-is-extortion/ (last accessed October 23, 2023).

[12] *Id.*

[13] *Id.*

92.     In many townships community-based organizations were formed to combat NextEra's political pressure and influence in the interest of the residents. One such organization, Bon Echo Area Residents Against Turbines (BEARAT), hired a lawyer who received documents under a Freedom of Information requests that pertained to NextEra's communications with the municipality of Addington Highlands (AH).[14]  The documents revealed that during the course of the negotiations, but for one exception, there is "no content concerning due diligence, risks or negative impacts on the Township" regarding NextEra's proposal, and that NextEra even supplied a NextEra-owned company as its municipality reference.[15]

93.     Emails from NextEra representatives show them repeatedly leveraging the community vibrancy funds as inducements to cause municipal officials to use their power under the Municipal Act to undertake government action in exchange for those inducements.[16] Other documents reveal that prior to public consultations or due diligence, in early April 2015 the AH Council was prepared to sign the Community Commitment Agreement due to the lavish inducements NextEra was negotiating under the guise of a community vibrancy fund.

94.     AH Councilor Hogg stated repeatedly that his support was directly related to the financial inducements "as opposed to general support for the actual proposal."  Another AH councilor, Yanch, who also voted in favor of support, owned a business that stood to benefit from NextEra's community vibrancy fund.[17]

---

[14] *Wind power developers dangle financial inducements in return for municipal support FOI docs reveal*, Wind Concerns Ontario (February 29, 2016), https://www.windconcernsontario.ca/2016/02/29/wind-power-developers-dangle-financial-inducements-in-return-for-municipal-support-foi-docs-reveal/ (last accessed October 23, 2023).

[15] *Id.*

[16] *Id.*

[17] *Id.*

95.     NextEra made clear that inducements were in jeopardy" if the officials did not act within NextEra's timeline, persuading the Council to act in the best interests of the NextEra, instead of the public interest.

**NextEra's Backroom Politics**

96.     The Company also utilized Matrix in 2019 to engineer the secret purchase of The Capitolist, a supposedly independent political news website in Tallahassee, Florida, to collect support for NextEra, weigh in with editorial decisions, and bash Company critics, according to a *CORPWATCH,* August 11, 2022 report.  The Capitolist focused criticism on individual journalists at news outlets like the Miami Herald, Palm Beach Post, and Florida Times-Union that had crossed the interests of the state's large corporations, like NextEra, according to a July 26, 2022 article in *The Florida Times-Union.*

97.     On August 2, 2022, *Politico* reported on a "new twist on the smoke-filled backroom dealmaking of Florida's past," about FPL's exclusive, invitation-only lounge for lawmakers and lobbyists at the Company's downtown Tallahassee offices:

> The third floor of the building, where the bar is located, has a series of large shutters that make its outdoor patio area impossible to see from the street level. The exclusive lounge is used by company officials to host lobbyists and the lawmakers whose votes they need, according to more than six people familiar with the space.

98.     Politico quoted Rep. Anna Eskamani (D-Orlando), one of FPL's biggest critics, who said the energy company's exclusive lounge raises concerns that FPL is illicitly influencing lawmakers and violating the state's gift ban and open meetings laws, which require public notice of gatherings when lawmakers discuss legislative business: "I don't understand why any electricity company needs a private, invite-only lounge for lawmakers that is next to the Florida Capitol,  Not only could this be a serious violation of Sunshine Laws and the legislature gift ban, but it all feeds

into our collective concern that FPL uses corrupt business practices to influence politicians, buy out media outlets, and undermine democracy."

**The Gainesville State Senate Race**

99.     In the 2018 election cycle, FPL and Matrix were focused on a Gainesville-area state Senate race and a Miami-Dade County Commissioner race, in what *Integrity Florida* referred to as a "trial run" for 2020.

100.     In the 2018 Gainesville state Senate race, Dr. Kayser Enneking, a strong Democratic candidate was threatening to unseat "an FPL friendly Republican incumbent." According to the *Integrity* Florida Report and an August 8, 2022 article in the *Tampa Bay Times* titled "This Florida Utility's Secret Cash Helped GOP Win State Senate Seat," FPL "used a Matrix-connected nonprofit called Broken Promises to secretly bankroll a spoiler' Democrat Charles Goston, who ran as a no-party candidate.  An August 14, 2022 article in *The Gainesville Sun* titled "Florida Power & Light tied to dark money used to help Sen. Keith Perry win 2018 Race," noted that diverting votes away from Enneking would benefit Perry in the closely contested race, helping ensure Republican control of the Senate, which confirms appointees to the FPSC.

101.     According to the *Integrity Florida* Report:

Leaked records from Matrix show FPL donated $200,000 to broken Promises which then donated $20,000 to the spoiler candidate's political committee and spent another roughly $115,000 on mailers and advertising supporting him. As a nonprofit, Broken Promises did not have to disclose its donors so the money could not be traced back to Florida Power and Light.

102.     According to the August 8, 2022 *Tampa Bay Times* article:

The records tying the utility to Broken Promises—which come from inside its political consulting firm—mark the first time that Florida Power & Light cash has been directly linked to a series of election scandals rocking Florida politics. They raise questions about whether the utility "subverted" a free and fair election in

30

Gainesville, said Saurav Ghosh, director of federal campaign finance reform at the nonpartisan Campaign Legal Center in Washington, D.C.

"This is pretty much the nightmare scenario," Ghosh said. "You have a powerful corporate player in Florida politics using its financial resources to defeat a candidate without any disclosure to the public. . . . This is election rigging."

As a corporation, Florida Power & Light is allowed to contribute to political campaigns. But under state and federal law, it's not permitted to hide contributions through "straw" donors. And tax-exempt nonprofits like Broken Promises, which the utility used as a pass-through, are supposed to engage primarily in charitable activities, not politics.

103.    The August 8, 2022 *Tampa Bay Times* article further stated that Broken Promises was run by Alabama political consultant Sean Jason Anderson, a friend of Matrix CEP Jason Pitts, and in one 2016 text exchange, Pitts assured FPL vice president Daniel Martell that they had full control over two other nonprofit groups run by Anderson and another ally—and the nonprofits would have no public ties to the utility because they didn't have to disclose their donors. "Bottom line is we are the ones with the check books and in control 100 percent" Pitts told Martell. The FPL Vice President responded: "This text is self-destructing in 30 seconds." "Yep, that's why I like face to face," Pitts replied. The *Times* article concluded that "[t]he text message would appear to contradict Florida Power & Light's assertion that it had no control over the nonprofits set up by its political consultants.

104.    The documents anonymously leaked to the *Orlando Sentinel* show FPL's connection to another dark-money nonprofit controlled by the same consultants. According to the December 2, 2021 *Orlando Sentinel* article, "the records obtained by the Sentinel include an internal ledger for a nonprofit called 'Mothers for Moderation.'" That ledger shows that ***FPL donated $14.5 million*** to Mothers for Moderation in 2018, representing nearly all of the money the dark-money group raised that year." (Bold and italics added). "The records also show that another entity controlled by the same consultants, which they associated with FPL in an internal

ledger, funded a group that paid for advertisements supporting an independent candidate in the general election who was working with Republican strategists and publicly attacked the Democratic candidate in the race."

105.    The December 2, 2021 *Orlando Sentinel* article further revealed that many of the Mothers for Moderation checks were signed by Matrix employee April Odom, "even though—as with Grow United—the name of one of Odom's siblings was the only name to appear in the organization's public records."

106.    The spoiler candidate succeeded in siphoning enough votes from the Democrat in the race to allow the Republican incumbent to keep the seat.

107.    On December 17, 2020, Citizens for Responsibility and Ethics in Washington ("CREW") filed a complaint with the IRS against Broken promises.  The complaint asked the IRS to "investigate whether Broken Promises, a nonprofit organization exempt from taxation pursuant to section 510(c)(4) of the Internal Revenue Code ("Code"), is operated primarily to influence political campaigns in violation of the Code. CREW further requested that "the IRS investigate whether Broken Promises violated federal law by failing to properly disclose its political contributions." According to the complaint, tax-exempt organizations under 501(c)(4) engaged in any "direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" must file a Schedule C with their tax returns disclosing any amounts spent on "political expenditures" to allow the IRS to track such expenditures and ensure that the appropriate taxes were paid.

108.    In the 2018 tax year, Broken Promises reported spending $161,010. According to Florida campaign finance reports filed by Friends of Charles Goston and Consumers for Energy Fairness, $160,470 of that spending was contributions to those political committees.  Yet, Broken

32

Promises did not disclose those contributions on its tax returns and instead asserted to the IRS

that it did not engage in any "direct or indirect political campaign activities on behalf of or in

opposition to candidates for public office," and failed to file a Schedule C. "Based on the

publicly available information, Broken Promises' activities do not comport with its claimed

status as a section 501(c)(4) tax exempt organization."

109.    In the 2018 Miami-Dade County Commission race, FPL wanted to drain votes away

from the incumbent Democrat Daniella Levine Cava who had clashed with FPL over its nuclear

power plant at Turkey Point on Biscayne Bay.  According to a December 30, 2021 *Orlando*

*Sentinel* article titled "Florida's dark money playbook; how ghost candidate scheme revealed

secretive political tactics," prior to the election, an anonymous anti-Cava website called "Keeping

Up With Cava" was launched funded by Matrix employees. According to the *Integrity Florida*

Report and other articles, in this case, Matrix recruited a surprising candidate, Jonathan Burke,

who had never run for office and had been arrested several times in the past, to run against Cava

and her Republican challenger. Text messages show that Burke met with Pitts in the summer of

2017.

110.    Leaked documents and ledgers from Matrix show it sent more than $120,000 in

FPL funds to another Alabama-based company called Tarella that had connections to Matrix.

Tarella was formed by former Matrix lobbyist Paul Hamrick, who worked closely with Pitts. The

*Integrity Florida* Report reported:

> Tarella paid the spoiler candidate a $60,000 salary in 2017 according to the
> candidate's financial disclosure filed for the county commission race.  Tarella also
> agreed to pay for the spoiler candidate's $2,300 monthly rent starting in 2017
> according to a letter the company sent to his landlord. Matrix also tried to help the
> spoiler candidate by covertly sending FPL money to a Washington D.C. based
> political consulting firm hired to advise the candidates, potentially a violation of
> state campaign finance laws.

111.    In the end, the scheme did not work and Cava won reelection. After the *Orlando Sentinel* exposed Matrix's involvement in the campaign, a December 30, 2021 article titled "Florida's dark money playbook: How ghost candidate scheme revealed secretive political tactics" detailed the many connections between FPL and Matrix. Thereafter, Cava had a sit down with top FPL executives, CEO Silagy and Pam Rauch, FPL's vice president for government relations. Cava later commented to the *Miami Herald*, "They were apologetic about what may have been done [and said] it was not done directly by them." The *Herald* further reported:

> But Silagy and Rauch had expressed far different sentiments in earlier text messages with Pitts — and they'd been more involved in efforts to go after Levine Cava than they'd let on at dinner, the messages show. During the 2020 mayoral race, Pitts and his team published attacks against Levine Cava in the Capitolist, a seemingly independent publication secretly financed by FPL through Matrix and run by a former FPL executive. "She deserves this!" Rauch texted Pitts in response to a Capitolist article ripping Levine Cava on June 4, 2020. The following day, Silagy responded with a text to Pitts that simply read: "Love it!"

112.    According to the *Integrity Florida* Report, "[w]hile it may have had its roots in the 2018 cycle, the ghost candidate scheme employed by Matrix and funded by Florida Power and Light came into full fruition in the 2020 election cycle.  Thoss behind the ghost candidate scheme targeted three state Senate races including Senate Districts 9, 37 and 39.

113.    NextEra and FPL diverted corporate resources to support the political efforts coordinated by Matrix during the 2020 election cycle. During this time, Matrix, on behalf of NextEra and FPL, allegedly surveilled journalists who authored negative stories about FPL and supported non-profit entities that contributed to "ghost candidates" to derail the campaign efforts of state legislators viewed unfavorably by NextEra and FPL.

114.    In 2021, Matrix's two principals had a contentious split.  Lawsuits followed and negative stories connecting FPL executives to Matrix's improper political conduct started leaking to the press. The *Orlando Sentinel*, *Miami Herald*, and *Floodlight* broke the story in late 2021 and

continued to cover it through summer 2022.

115.     On December 2, 2021, the *Orlando Sentinel* published an article titled "Florida Power and Light execs worked closely with consultants behind 'ghost' candidate scheme, records reveal," linking FPL executives directly to the "ghost candidates" scheme to promote "spoiler" candidates in the three key state Senate elections in 2020, according to documents obtained by the Sentinel. According to the article, records show that the consultants who controlled Grow United Inc., "the dark-money nonprofit at the center of the 'ghost' candidate scandal, billed FPL for more than $3 million days before they began moving money through the entity." The article continued:

> The records also show FPL has donated more than $10 million in recent years to other dark-money non-profits controlled by some of the same consultants – and FPL CEO and President Eric Silagy has personally coordinated with those consultants on campaign contributions made through their nonprofits.

116.     The December 2nd *Orlando Sentinel* article continued:

> Money from Grow United was used to promote independent candidates in three Senate races – District 9 in Central Florida and South Florida's districts 37 and 39 – in an apparent effort to siphon votes from Democratic candidates and help Republicans retain control of the 40-member Florida Senate.

> The controversy has set off a wide-ranging criminal investigation by prosecutors in Miami, who have already secured a guilty plea from the independent candidate in District 37 and filed felony charges against Frank Artiles, a former Republican lawmaker accused of bribing the candidate to run.

> That investigation and the Sentinel's reporting have revealed extensive ties between the consultants behind the scheme and powerful business interests in Florida – but the new records show how closely those consultants were working with FPL specifically.

117.     According to the *Integrity Florida* Report:

> The ghost candidates in the three 2020 Senate races were Jestine Iannotti in Senate District 9, Alex Rodriguez in Senate District 37, and Celso Alfonso in Senate District 39. None of these candidates actively campaigned or even publicly expressed interest in serving in office if they were elected. The advertising

supporting these ghost candidates, which was paid for by money Grow United sent to two Florida-based political committees, was intentionally misleading.

**Senate Districts 37 and 39**

118.     According to the *Integrity Florida* Report, the race for District 37 most clearly

demonstrated how a spoiler candidate could change the outcome of an election:

> Democratic state Senator Jose Javier Rodriguez was seeking reelection and faced two opponents, Republican Ileana Garcia and No Party Affiliated candidate Alex Rodriguez. It was a seat that was generally considered safe for the incumbent. But state Senator Jose Javier Rodriguez had angered Eric Silagy, the CEO of Florida Power and Light by proposing a law that could cut into FPL's profits. Silagy wrote a 2019 email to two of his vice presidents directing them to make the state Senator's life "a living hell."

> One of the vice presidents immediately forwarded the email to the CEO of Matrix. . .. The email is part of a trove of Matrix documents and ledgers that were anonymously leaked to the Orlando Sentinel, Miami Hearld and other news outlets.

> Records also show that Data Targeting, a Gainesville-based political consulting firm, had a $15,000 a month contract with former South Florida Senator Frank Artiles to work on "certain contested Florida Senate Districts in Miami-Dade County – at the same time Data Targeting was being paid millions of dollars by state Republican leaders to run Senate campaigns.

> Artiles recruited two ghost candidates to run in neighboring Senate Districts 37 and 39. One of the candidates, Alex Rodriguez, who had the same last name as the incumbent Senator, admitted Artiles paid him nearly $45,000 in bribes in exchange for putting his name on the ballot. The scheme was intended to mislead voters and siphon votes away from Senator Jose Javier Rodriguez and help the Republican win the race.

> Leaked records show that Matrix used their dark-money nonprofit Grow United to fund two Florida political committees which paid for advertising in the race promoting the ghost candidate, Alex Rodriguez, as a left-leaning progressive.

> In the race for Senate District 37, the ghost candidate scheme worked as intended. The Republican candidate, Ileana Garcia, won the election by just 32 votes over the incumbent Democrat. The ghost candidate received 6,382 votes, easily enough votes to swing the election to the Republican candidate.

119.     The *Integrity Florida* Report continued that:

Five people, including ghost candidates Alex Rodriguez and Jestine Iannelli, were charged in two separate criminal investigations into the ghost candidate scheme. . .

Alex Rodriguez has pled guilty and has agreed to testify at the trial of Frank Artiles. Artiles trial is currently scheduled for December 2022.

Neither the consulting firm Matrix or their client Florida Power and Light have been charged for their roles in the ghost candidate scheme.  In August 2022, long-time Tampa Democratic Congresswoman Kathy Castor called on the Department of Justice to investigate Florida Power and Light over its use of dark money to manipulate elections.

"Generally, electric utilities should operate in the public interest and it appears that FPL and its officers use dark money, pressure campaigns and illicit, and possibly illegal, activity to disadvantage the citizens of Florida," U.S. Rep. Kathy  Castor wrote in a letter to U.S. Attorney General Merrick Garland.

120.    The December 2nd *Orlando Sentinel* article referenced above quoted FPL spokesperson Defendant Reuter who denied the company had any role in the "ghost candidate" scheme.  Specifically, Reuter stated the following:

Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle. Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false, and we have found absolutely no evidence of any legal wrongdoing by FPL or its employees.

121.    On December 17, 2021, the *Orlando Sentinel* published another story revealing the existence of a November 2019 memo from Matrix to Silagy that described how FPL funds could be filtered through shell non-profits to conceal their source.

122.    The same day, when confronted with the November 2019 memorandum by the *Orlando Sentinel*, Defendant Reuter said, "we have found no evidence that FPL or our employees used this proposal to support our communication and outreach activities during the 2020 election cycle:"

Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding structure for 501C(4) organizations and we had no knowledge of this structure

being used by Matrix. We are aware of the proposed structure as the legal memo was shared with us, and as we understand it, Joe Perkins' team at Matrix created a proposal to fund their clients' communication and outreach activities during 2020.

123.    On January 25, 2022, Defendant Robo stated the following on a call with investors and analysts:

> I think on some of the Florida political headlines, I think what I'd like to say on that is pretty simple. When we got -- when we received the report and those allegations that have been in the press, we conducted a very extensive and thorough investigation that included looking at company financial records. It included looking at everyone who was named in its company emails, also looking at their– they've all provided access to their personal emails and text to us as part of that investigation. And the bottom line is we found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees. And so that's kind of the bottom line. And I feel very good about the investigation that we did, and I feel very good that there is no basis to any of these allegations….

124.    On February 18, 2022, NextEra filed its Annual Report on Form 10-K with the SEC, for the year ended December 31, 2021 ("2021 Form 10-K"). The 2021 Form 10-K omitted any disclosure to investors that FPL's and NextEra's business and reputation might be adversely affected by allegations that FPL or the Company had violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations, arising from alleged violations of Florida state and federal campaign finance law.

**The Ghost Candidate Scandal**

125.    FPL's operations are subject to strict regulation by a number of federal, state and other organizations, the most important of which is the Florida Public Service Commission ("FPSC"). Not only does the FPSC have jurisdiction over retail sales, it also regulates FPL's service areas, issuances of securities, and planning, siting and construction of facilities, among other things. 2022 Form 10-K. According to the 2022 Form 10-K, the FPSC is charged with setting "rates at a level that is intended to allow the utility the opportunity from retail customers total revenues . . . equal to its cost of providing service, including a reasonable rate of return on invested

capital." According to testimony of Scott Bores, VP of Finance for FPL and the presentation of NextEra's counsel on February 21, 2023, in *In the Matter of the Appeal of: NextEra Energy Capital Holdings, Inc., and Affiliates, Appellant,* State of California Office of Tax Appeals, County of Sacramento, Case No. 20096580, the FPSC essentially acts as "another set of board of directors" to FPL. Transcript of proceedings at 23, 48.

126.    The FPSC consists of five members appointed by the Governor and confirmed by the Senate who serve staggered terms. See Chapter 350, Florida Statutes (F.S.) § 350.01; Florida Public Service Commission, "Statement of Agency Organization & Operations." Nominees to the FPSC are selected and presented to the Governor by the twelve-member Florida Public Service Commission Nominating Council. See F.S. § 350.031(6). Six members of the Nominating Counsel are appointed by the Speaker of the Florida House of Representatives, three of whom must be members of the Florida House. F.S. § 350.031(1). Six members, including three members of the Senate, are appointed by the President of the Florida Senate. *Id.* Each appointee to the FPSC must be approved by the Florida Senate. *See* F.S. § 350.031(8).

127.    Due to the significant impact the FPSC can have on the Company and business and operations, and its ability to generate revenues and profits, it is not surprising that lobbying and political donations are major focuses of NextEra and FPL. As the *Miami Hearld* noted in an October 26, 2021 article titled "Residential Customers to Bear Brunt of $1.5 Billion FPL Rate Hike," "[t]he company has invested millions in campaign contributions to elected officials from both parties, particularly the governor and legislators, who nominate and appoint members of the PSC." According to a February 26, 2018 article by the *Energy and Policy Institute* titled "Utility Industry Contributing Millions to National Political Party Groups," in 2017 the Democratic Legislative Campaign Committee "got the bulk of its utility donations" from five companies, one

39

of which was NextEra, and NextEra was one of the three largest contributors to the Democratic

Attorneys General Association. Between 2008-2017, NextEra was the number one contributor to

Republican IRS 527 political organizations, having contributed $5,482,429, and was the fourth

highest contributor to Democratic IRS 527 political organizations, having contributed $1,095,450.

128.    Recognizing the significant reputational harm and business risks that improper

political activity might cause the Company, certain shareholders of NextEra repeatedly asked the

Board for additional transparency and disclosure of political activity and contributions. For

example, every year from 2015 through 2019, a large institutional shareholder of NextEra, the

New York State Common Retirement Fund (the "Fund"), advanced a shareholder proposal in

connection with the Company's annual meeting, that would require the Company to provide

disclosures and transparency in connection with its political contributions. The Fund argued,

among other things, that such disclosure was in the best interest of the Company and its

shareholders. Each year, NextEra's Board fought back, opposing those proposals and

recommending that shareholders vote *against* them arguing, among other things, that additional

disclosures were not in the Company or shareholders' best interest. Ultimately, the proposals

advanced by the Fund failed.

129.    On August 2, 2022, *Politico* reported on a "new twist on the smoke-filled backroom

dealmaking of Florida's past," about FPL's exclusive, invitation-only lounge for lawmakers and

lobbyists at the Company's downtown Tallahassee offices:

> The third floor of the building, where the bar is located, has a series of large
> shutters that make its outdoor patio area impossible to see from the street level.
> The exclusive lounge is used by company officials to host lobbyists and the
> lawmakers whose votes they need, according to more than six people familiar
> with the space.

130.    Politico quoted Rep. Anna Eskamani (D-Orlando), one of FPL's biggest critics,

who said the energy company's exclusive lounge raises concerns that FPL is illicitly influencing lawmakers and violating the state's gift ban and open meetings laws, which require public notice of gatherings when lawmakers discuss legislative business: "I don't understand why any electricity company needs a private, invite-only lounge for lawmakers that is next to the Florida Capitol, Not only could this be a serious violation of Sunshine Laws and the legislature gift ban, but it all feeds into our collective concern that FPL uses corrupt business practices to influence politicians, buy out media outlets, and undermine democracy."

131.    According to a December 2022 report by Ben Wilcox of *Integrity Florida*,[18] titled "'Ghost Candidates' How They Manipulate (and sometimes steal) Florida Elections," (the *Integrity Florida* Report"), the term "ghost candidate" was first used in Florida press reports to describe a political "dirty trick" that took place in three state Senate races during the 2020 election cycle. The reported continued: "In the Senate races for Districts 9, 37 and 39, No Party Affiliated candidates were essentially bribed to enter the races in a scheme to siphon votes away from Democratic candidates in favor of their Republican opponents."

132.    The "ghost" candidate scheme and the ties to FPL and Matrix have been extensively document in multiple reports including the *Integrity Florida* Report, and in investigative articles in the *Orlando Sentinel,* Associated *Press, Miami Hearld,* and *Tampa Bay Times,* among others. According to a December 2, 2021, article in the *Orlando Sentinel* titled "Florida Power and Light execs worked closely with consultants behind 'ghost' candidate scheme, the revelation of the scheme and FPL's ties thereto were based on a "cache of new documents [that] was anonymously delivered to the Sentinel last week, including checks, bank statements, emails, text messages,

---

[18] *Integrity Florida* describes itself as a nonprofit, nonpartisan research institute and government watchdog whose stated mission is to promote integrity in government and expose public corruption.

invoices, internal ledgers and more covering a roughly four-year period between 2016 and 2020, all of which were apparently unearthed during an internal investigation by a former FPL contractor." As one of its Key Findings, the *Integrity Florida* Report concluded that FPL "provided 'dark money' funding for the ghost candidate scheme and, along with its Alabama based political consulting firm Matrix, was actively involved in the strategic planning to carry out the scheme." And, while most reporting initially focused on the 2020 election cycle, later reporting showed that the same players were using dark money political committees and nonprofits to manipulate elections in the 2018 election cycle.

133.    In the 2018 election cycle, FPL and Matrix were focused on a Gainesville-area state Senate race and a Miami-Dade County Commissioner race, in what *Integrity Florida* referred to as a "trial run" for 2020.

134.    On December 2, 2021, the *Orlando Sentinel* published an article titled "Florida Power and Light execs worked closely with consultants behind 'ghost' candidate scheme, records reveal," linking FPL executives directly to the "ghost candidates" scheme to promote "spoiler" candidates in the three key state Senate elections in 2020, according to documents obtained by the Sentinel. According to the article, records show that the consultants who controlled Grow United Inc., "the dark-money nonprofit at the center of the 'ghost' candidate scandal, billed FPL for more than $3 million days before they began moving money through the entity." The article continued:

> The records also show FPL has donated more than $10 million in recent years to other dark-money non-profits controlled by some of the same consultants – and FPL CEO and President Eric Silagy has personally coordinated with those consultants on campaign contributions made through their nonprofits.

135.    The December 2nd *Orlando Sentinel* article continued:

> Money from Grow United was used to promote independent candidates in three Senate races – District 9 in Central Florida and South Florida's districts 37 and 39 – in an apparent effort to siphon votes from Democratic candidates and help

Republicans retain control of the 40-member Florida Senate.

The controversy has set off a wide-ranging criminal investigation by prosecutors in Miami, who have already secured a guilty plea from the independent candidate in District 37 and filed felony charges against Frank Artiles, a former Republican lawmaker accused of bribing the candidate to run.

That investigation and the Sentinel's reporting have revealed extensive ties between the consultants behind the scheme and powerful business interests in Florida – but the new records show how closely those consultants were working with FPL specifically.

136.    According to the *Integrity Florida* Report:

The ghost candidates in the three 2020 Senate races were Jestine Iannotti in Senate District 9, Alex Rodriguez in Senate District 37, and Celso Alfonso in Senate District 39. None of these candidates actively campaigned or even publicly expressed interest in serving in office if they were elected. The advertising supporting these ghost candidates, which was paid for by money Grow United sent to two Florida-based political committees, was intentionally misleading.

137.    The "ghost" candidate in Senate District 9 was a little-known independent candidate, Jestine Iannotti. According to a December 30, 2021 *Orlando Sentinel* article titled "Florida's dark money playbook: How 'ghost' candidate scheme revealed secretive political tactics," voters in Seminole and Volusia counties that would help decide "one of the closest state Senate elections in Florida" began receiving mailers featuring "a stock photo of a black woman, promised a candidate free from the influence of special interests who would 'change the politics in Tallahassee,' and emphasized her focus on social justice, climate change and campaign finance reform." However, according to the *Sentinel,* "[i]t was pure fiction."

Iannotti is a white woman who was already planning to move to Sweden. The mailers were designed by Republican strategists in Tallahassee. And the dark money that financed the ad campaign was controlled by consultants working closely with utility giant Florida Power & Light – whose corporate lobbyists were privately rooting for the Republican candidate and eventual winner of the race, Sen. Jason Brodeur of Sanford.

138.    According to a May 25, 2022 *Orlando Sentinel* article titled, "'Ghost' candidate

Jestine Iannotti booked into Seminole jail, bonds out," Iannotti was charged with five misdemeanors and one felony and was accused of accepting an illegal $1,200 contribution from political consultant Eric Foglesong, and, along with him, reporting false donor names to the state for other contributions. Foglesong was charged with five counts including three felonies.

139.    According to the *Integrity Florida* Report, the race for District 37 most clearly demonstrated how a spoiler candidate could change the outcome of an election:

> Democratic state Senator Jose Javier Rodriguez was seeking reelection and faced two opponents, Republican Ileana Garcia and No Party Affiliated candidate Alex Rodriguez. It was a seat that was generally considered safe for the incumbent. But state Senator Jose Javier Rodriguez had angered Eric Silagy, the CEO of Florida Power and Light by proposing a law that could cut into FPL's profits. Silagy wrote a 2019 email to two of his vice presidents directing them to make the state Senator's life "a living hell."
>
> One of the vice presidents immediately forwarded the email to the CEO of Matrix. . . The email is part of a trove of Matrix documents and ledgers that were anonymously leaked to the Orlando Sentinel, Miami Hearld and other news outlets.
>
> Records also show that Data Targeting, a Gainesville-based political consulting firm, had a $15,000 a month contract with former South Florida Senator Frank Artiles to work on "certain contested Florida Senate Districts in Miami-Dade County – at the same time Data Targeting was being paid millions of dollars by state Republican leaders to run Senate campaigns.
>
> Artiles recruited two ghost candidates to run in neighboring Senate Districts 37 and 39. One of the candidates, Alex Rodriguez, who had the same last name as the incumbent Senator, admitted Artiles paid him nearly $45,000 in bribes in exchange for putting his name on the ballot. The scheme was intended to mislead voters and siphon votes away from Senator Jose Javier Rodriguez and help the Republican win the race.
>
> Leaked records show that Matrix used their dark-money nonprofit Grow United to fund two Florida political committees which paid for advertising in the race promoting the ghost candidate, Alex Rodriguez, as a left-leaning progressive.
>
> In the race for Senate District 37, the ghost candidate scheme worked as intended. The Republican candidate, Ileana Garcia, won the election by just 32 votes over the incumbent Democrat. The ghost candidate received 6,382 votes, easily enough votes to swing the election to the Republican candidate.

140.    The *Integrity Florida* Report continued that:

> Five people, including ghost candidates Alex Rodriguez and Jestine Iannelli, were charged in two separate criminal investigations into the ghost candidate scheme. . .
>
> Alex Rodriguez has pled guilty and has agreed to testify at the trial of Frank Artiles. Artiles trial is currently scheduled for December 2022.
>
> Neither the consulting firm Matrix or their client Florida Power and Light have been charged for their roles in the ghost candidate scheme. In August 2022, long-time Tampa Democratic Congresswoman Kathy Castor called on the Department of Justice to investigate Florida Power and Light over its use of dark money to manipulate elections.
>
> "Generally, electric utilities should operate in the public interest and it appears that FPL and its officers use dark money, pressure campaigns and illicit, and possibly illegal, activity to disadvantage the citizens of Florida," U.S. Rep. Kathy Castor wrote in a letter to U.S. Attorney General Merrick Garland.

141.    The December 2nd *Orlando Sentinel* article referenced above quoted FPL spokesperson Defendant Reuter who denied the company had any role in the "ghost candidate" scheme. Specifically, Reuter stated the following:

> Neither FPL nor our employees provided funding, or asked any third party to provide funding on its behalf, to Grow United in support of Florida state-level political campaigns during the 2020 election cycle. Any report or suggestion that we had involvement in, financially supported or directed others to support any 'ghost' candidates during the 2020 election cycle is patently false, and we have found absolutely no evidence of any legal wrongdoing by FPL or its employees.

142.    On December 17, 2021, the *Orlando Sentinel* published another story revealing the existence of a November 2019 memo from Matrix to Silagy that described how FPL funds could be filtered through shell non-profits to conceal their source.

143.    The same day, when confronted with the November 2019 memorandum by the *Orlando Sentinel*, Defendant Reuter said, "we have found no evidence that FPL or our employees used this proposal to support our communication and outreach activities during the 2020 election cycle:"

45

> Neither FPL nor Eric Silagy requested Matrix to set up any proposed funding structure for 501C(4) organizations and we had no knowledge of this structure being used by Matrix. We are aware of the proposed structure as the legal memo was shared with us, and as we understand it, Joe Perkins' team at Matrix created a proposal to fund their clients' communication and outreach activities during 2020.

144.    On January 25, 2022, Defendant Robo stated the following on a call with investors and analysts:

> I think on some of the Florida political headlines, I think what I'd like to say on that is pretty simple. When we got -- when we received the report and those allegations that have been in the press, we conducted a very extensive and thorough investigation that included looking at company financial records. It included looking at everyone who was named in its company emails, also looking at their–they've all provided access to their personal emails and text to us as part of that investigation. And the bottom line is we found no evidence of any issues at all, any illegality or any wrongdoing on the part of FPL or any of its employees. And so that's kind of the bottom line. And I feel very good about the investigation that we did, and I feel very good that there is no basis to any of these allegations…

145.    On February 18, 2022, NextEra filed its Annual Report on Form 10-K with the SEC, for the year ended December 31, 2021 ("2021 Form 10-K"). The 2021 Form 10-K omitted any disclosure to investors that FPL's and NextEra's business and reputation might be adversely affected by allegations that FPL or the Company had violated laws, by any investigations or proceedings that arise from such allegations, or by ultimate determinations of legal violations, arising from alleged violations of Florida state and federal campaign finance law.

### The False and Misleading 2022 Proxy

146.    On April 1, 2022, NextEra filed its 2022 Proxy with the SEC, wherein Defendants solicited shareholder votes in favor of five proposals, including the re-election of Defendants Barrat, Camaren, Dunn, Gursahaney, Hachigian, Ketchum, Lane, Porges, Robo, Schupp, Skolds, Stall, and Wilson and non-binding approval of certain executive compensation.

147.    The 2022 Proxy stated that Robo served as chairman of FPL until March 2022.  The

2022 Proxy stated that NextEra had adopted a Code of Business Conduct & Ethics applicable to all representatives of NextEra Energy and its subsidiaries, including directors…."

148.    The 2022 Proxy stated that the "Board has instructed the General Counsel to assist the Board in reviewing all written communications" regarding inter alia internal and external complaints, including as they relate to subsidiaries. The 2022 Proxy also noted that the Audit Committee oversees compliance with legal and regulatory requirements as well as "major risks" to the Company but failed to disclose that none of the Board Committees were charged with overseeing subsidiary compliance or specifically with campaign finance compliance in connection with its lobbying activities.

149.    The 2022 Proxy asked shareholders to ratify the compensation paid to the Company's named executive officers, the specifics of which were reflected in the below slide:

| Named Executive Officer | 2021 Target Annual Incentive | 2021 Annual Incentive Award |
| --- | --- | --- |
| James L. Robo | $2,495,000 | $4,992,000 |
| Rebecca J. Kujawa | $ 612,500 | $1,225,000 |
| John W. Ketchum | $ 980,000 | $1,960,000 |
| Eric E. Silagy | $ 980,000 | $1,960,000 |
| Charles E. Sieving | $ 649,560 | $1,299,100 |

150.    In connection with these awards, the 2022 Proxy stated, "in years where the Company's performance is above or substantially above the performance of its peers…as it was in 2021, the Company expects that annual incentive awards will be paid…at a rate exceeding the target rate." The 2022 Proxy, however, failed to disclose that the Company was beset with compliance problems that posed significant risks of harm, and that the Board lacked a system to oversee mission-critical compliance risks related to its subsidiaries and campaign finance laws.

151.    The 2022 Proxy also was false and misleading in that it failed to disclose that: (1) contrary to the 2022 Proxy's descriptions of the Board's risk oversight function and the Audit

Committee's responsibilities, the Board and its Committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements and violate campaign finance laws, and thus the Defendants on the Board breached their fiduciary duties; and (2) the Defendants on the Board at that time who breached their fiduciary duties were improperly interested in increasing their unjust compensation.

152.    The false and misleading elements of the 2022 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors and the approval of executive compensation.

153.    As detailed below, Defendants breached their fiduciary duties *inter alia* by making or permitting the issuance of false and misleading statements and failing to disclose that: (1) FPL's political misconduct exposed NextEra to substantial legal and reputational risk; and (2) the Company and the Individual Defendants did not maintain adequate internal controls; and (3) in light of the above, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. Further, while the ghost candidate scandals were actively ongoing, the Board was actively opposing proposals from certain NextEra shareholders to require the Company to disclose the very payments at the heart of the scheme. Indeed, the shareholders' concerns were that such payments might cause NextEra reputational harm and negatively impact long-term shareholder value.

154.    As the Company's Annual Report on Form 10-K for the year ended December 31, 2022 filed with the SEC on February 17, 2023 ("2022 Form 10-K") explains:

> FPL is a rate regulated electric utility engaged primarily in the generation, transmission, distribution and sale of electric energy in Florida. FPL is the largest electric utility in the state of Florida and one of the largest electric utilities in the U.S. At December 31, 2022, FPL had approximately 32,100 MW of net generating capacity, approximately 88,000 circuit miles of transmission and distribution lines and 871 substations. FPL provides service to its electric

customers through an integrated transmission and distribution system that links its generation facilities to its customers. FPL also owns a retail gas business, which serves approximately 119,000 residential and commercial natural gas customers in eight counties throughout southern Florida with 3,795 miles of natural gas distribution pipelines.

FPL serves more than 12 million people through approximately 5.8 million customer accounts.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

155. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

156. NextEra is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

157. Plaintiff is a current shareholder of NextEra and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

158. At the time this action was commenced, the thiurteen-member Board was comprised of Defendants Ketchum, Arnaboldi, Barrat, Camaren, Dunn, Gursahaney, Hachigian, Lane, Porges, Stall, and Wilson (the "Director Defendants") and non-parties Stahlkoph and Henry (collectively, the "Demand Board"). Accordingly, Plaintiff is only required to show that seven of the Demand Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

159. The Company's 2023 proxy statement, filed with the SEC on April 5, 2023, concedes Ketchum, as the current Chairman and CEO, is not independent.

160. As set forth below, each member of the Demand Board, and if not all at least the

eleven Director Defendants, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

161.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. The Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the Company to violate the law, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

162.    The Director Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Director Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

163.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. As Board members of NextEra, the Director Defendants knew, or should have known, the material facts surrounding NextEra's compliance with campaign finance and securities laws, and the accuracy of its public statements.

164.    The entire Demand Board is subject to the Company's Code of Conduct. The Code

goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the members of the Demand Board to also adhere to NextEra's standards of business conduct. The Director Defendants violated the Code because they knowingly or recklessly allowed the Company to violate the law. The entire Demand Board violated the Code, including by refusing to take action to address the misconduct alleged herein. As such, the entire Demand Board faces a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

165.    The Audit Committee is and was responsible for, *inter alia*, overseeing "the integrity of the financial statements of the Company" and "compliance by the Company with legal and regulatory requirements." Director Defendants Gurshaney (Chair), Dunn, Stall and Wilson, as members of the Audit Committee breached their fiduciary duties by declining to act in the face of repeated red flags that the Company was deficient in meeting its compliance and reporting obligations. Those Director Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

166.    Demand in this case is excused because each of the directors derive substantial revenue from the Company, they control the company, and are indebted to each other.

167.    Accordingly, a pre-suit demand on the Demand Board is futile and excused.

### COUNT I
**Against the Director Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

168.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

169.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

170.     Under the direction and watch of the Director Defendants, the 2022 Proxy failed to disclose, inter alia: (1) contrary to the Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board breached their fiduciary duties; and (2) the Defendants on the Board at that time who breached their fiduciary duties were improperly interested in increasing their unjust compensation.

171.     The 2022 Proxy further failed to disclose that the Company was violating campaign finance laws, issuing false and misleading statements in violation of securities laws, and had failed to establish or maintain adequate internal controls. As a result, the 2022 Proxy was materially false and misleading.

172.     In the exercise of reasonable care, these Defendants should have known that the statements contained in the Proxy were materially false and misleading.

173.     The misrepresentations and omissions in the 2022 Proxy were material to Company

stockholders in voting on the 2022 Proxy. The misrepresentations and omissions were material to Company stockholders in voting on the matters set forth for stockholder determination in the Proxy, including but not limited to the reelection of certain Director Defendants and the approval, on an advisory basis, of the compensation of the Company's executives.  The 2022 Proxy was an essential link in defendants' insulation of the awards from stockholder challenge.

174.     The false and misleading elements of the 2022 Proxy led to, among other things, the election of the Defendants Barrat, Camaren, Dunn, Gursahaney, Hachigian, Ketchum, Lane, Porges, Robo, Schupp, Skolds, Stall, and Wilson, which allowed them to continue to breach their fiduciary duties to NextEra.

175.   The Company was damaged as a result of the defendants' material misrepresentations and omissions in the 2022 Proxy.

176.     No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

<u>**COUNT II**</u>
**Against the Individual Defendants for Breach of Fiduciary Duty**

177.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

178.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

179.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be

disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

181.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

### <u>COUNT III</u>
### Against the Individual Defendants for Unjust Enrichment

182.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, NextEra.

183.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from NextEra that was tied to the performance or artificially inflated valuation of NextEra, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

184.    Plaintiffs, as shareholders and representatives of NextEra, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits and other

compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

185.    Plaintiffs on behalf of NextEra have no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants for Waste of Corporate Assets**

186.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of NextEra's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

187.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Action, and approving performance-based compensation linked to the Company's perceived successes.

188.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

189.    Plaintiffs on behalf NextEra have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and

55

all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

   C. Ordering the Individual Defendants to remediate the internal control deficiencies set forth herein, to cause the Company to comply with all regulations applicable to political actions, and to abstain from future violations of regulations with respect to political actions;

   D. Awarding punitive damages;

   E. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

   F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

   Plaintiff hereby demands a trial by jury.

Date: November 7, 2023      Respectfully submitted,

           **STEINLAW FLORIDA, PLLC**

         By: /s/ Jonathan M. Stein
           Jonathan M. Stein (Fla. Bar No. 9784)
           1825 NW Corporate Blvd., Suite 110
           Boca Raton, FL 33431
           Telephone: (561) 834-2699
           Email: Jon@SteinLawFlorida.com

           *Counsel for Plaintiff*

OF COUNSEL*:*

**MORRIS KANDINOV LLP**
Leonid Kandinov (*pro hac* forthcoming)
Aaron T. Morris (*pro hac* forthcoming)
550 West B Street, 4th Floor
San Diego, CA 92101
(619) 780-3993
aaron@moka.law
leo@moka.law

## VERIFICATION

I, Amy Lamborn, am a plaintiff in this action. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

10/30/2023

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of October, 2023.

DocuSigned by:

*Amy Lamborn*

8A2DD40AB6E14FE...

_____

AMY LAMBORN